(Slip Opinion) OCTOBER TERM, 2010 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CSX TRANSPORTATION, INC. *v.* ALABAMA DEPARTMENT OF REVENUE ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 09–520. Argued November 10, 2010—Decided February 22, 2011

Petitioner (CSX) is an interstate rail carrier that operates, and pays taxes, in Alabama. The State imposes sales and use taxes on railroads when they purchase or consume diesel fuel, but exempts their main competitors—interstate motor and water carriers. CSX sued respondents, the Alabama Department of Revenue and its Commissioner (Alabama), claiming that this tax scheme discriminates against railroads in violation of the Railroad Revitalization and Regulatory Reform Act of 1976 (4–R Act or Act), which bars four forms of discriminatory taxation, 49 U. S. C. §11501(b). Three of the delineated prohibitions deal with property taxes, §§11501(b)(1)–(3), and the fourth is a catch-all provision that forbids a State to "[i]mpose another tax that discriminates against a rail carrier," §11501(b)(4). The District Court dismissed CSX's suit as not cognizable under the 4–R Act on the basis of this Court's decision in *Department of Revenue of Ore.* v. *ACF Industries, Inc.*, 510 U. S. 332, and the Eleventh Circuit affirmed.

*Held:* CSX may challenge Alabama's sales and use taxes under §11501(b)(4). Pp. 5–19.

  (a) CSX is challenging "another tax" within subsection (b)(4)'s plain meaning. The Act does not define "tax." Thus, this Court looks to the word's ordinary definition, which is expansive. A State seeking to raise revenue may choose among multiple forms of taxation on property, income, transactions, or activities. "[A]nother tax" is thus best understood to encompass any tax a State might impose, on any asset or transaction, except the property taxes already addressed in subsections (b)(1)–(3). There is no reason to interpret subsection (b)(4) as applying only to the gross-receipts taxes that some States imposed

in lieu of property taxes at the time of the Act's passage. Moreover, CSX's complaint, contrary to the Eleventh Circuit's apparent view, does protest Alabama's imposition of taxes on its fuel. The exemptions the State has given may play a central role in CSX's argument, but the complaint's essential subject remains the taxes imposed.

The key question thus becomes whether a tax might be said to "discriminate" against a railroad under subsection (b)(4) where the State has granted exemptions from the tax to other entities (here, the railroad's competitors). Because the statute does not define "discriminates," the Court again looks to the term's ordinary meaning, which is to fail to treat all persons equally when no reasonable distinction can be found between those favored and those not favored. To charge one group of taxpayers a 2% rate and another group a 4% rate, if the groups are the same in all relevant respects, is to discriminate against the latter. That discrimination continues if the favored group's rate goes down to 0%, which is all an exemption is. To say that such a tax does not "discriminate" is to adopt a definition at odds with the word's natural meaning. This Court has repeatedly recognized that tax schemes with exemptions may be discriminatory. See, *e.g., Davis* v. *Michigan Department of Treasury*, 489 U. S. 803. And even *Department of Revenue of Ore.* v. *ACF Industries, Inc.*, 510 U. S. 332, on which the Eleventh Circuit heavily relied in dismissing CSX's suit, made clear that tax exemptions "could be a variant of tax discrimination." *Id.,* at 343. In addition, the statute's prohibition of discrimination applies regardless whether the favored entities are interstate or local. The distinctions drawn in the statute are not between interstate and local actors, as Alabama suggests, but between railroads and all other actors, whether interstate or local. Pp. 5–10.

(b) *ACF Industries* does not require a different result. There, the Court held that railroads could not contest property tax exemptions under subsection (b)(4), reasoning that it would be illogical to permit such a challenge when subsections (b)(1)–(3)—the §11501 provisions specifically addressing property taxes—permitted States to grant property tax exemptions. Such a reading would "subvert the statutory plan" and "contravene the 'elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.'" 510 U. S., at 340. Contrary to Alabama's argument, this structural analysis does not apply here. Subsections (b)(1)–(3) specifically allow property tax exemptions, but neither they nor any other provision of the Act speaks to non-property exemptions like those at issue here. Because Congress has expressed no intent to "allo[w] the States to grant" non-property exemptions, *id.,* at 343, reading subsection (b)(4) to encompass them poses no danger of "nullify[ing]" a congressional policy choice or otherwise "subverting the

Syllabus

statutory plan," *id.*, at 340, 343**.** Alabama's other efforts to borrow from *ACF Industries*' analysis similarly fail. Also unavailing is Alabama's argument that, even if *ACF Industries'* reasoning is limited to property tax exemptions, its holding must extend to non-property tax exemptions in order to prevent inconsistent or anomalous results in the treatment of property and non-property taxes. Pp. 11–18.

350 Fed. Appx. 318, reversed and remanded.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, BREYER, ALITO, and SOTOMAYOR, JJ., joined. THOMAS, J., filed a dissenting opinion, in which GINSBURG, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 09–520

CSX TRANSPORTATION, INC., PETITIONER *v.* ALABAMA DEPARTMENT OF REVENUE ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[February 22, 2011]

JUSTICE KAGAN delivered the opinion of the Court.

The Railroad Revitalization and Regulatory Reform Act of 1976 restricts the ability of state and local governments to levy discriminatory taxes on rail carriers. We consider here whether a railroad may invoke this statute to challenge sales and use taxes that apply to rail carriers (among others), but exempt their competitors in the transportation industry. We conclude that the railroad may do so.

I

A

Congress enacted the Railroad Revitalization and Regulatory Reform Act of 1976 (Act or 4–R Act) to "restore the financial stability of the railway system of the United States," among other purposes. §101(a), 90 Stat. 33. To help achieve this goal, Congress targeted state and local taxation schemes that discriminate against rail carriers. *Burlington Northern R. Co.* v. *Oklahoma Tax Comm'n*, 481 U. S. 454, 457 (1987). The provision of the Act at issue

here, now codified at 49 U. S. C. §11501,[1] bars States and localities from engaging in four forms of discriminatory taxation. 90 Stat. 54.

Section 11501(b) describes the prohibited practices. It begins with three provisions addressed specifically to property taxes; it concludes with a catch-all provision concerning other taxes. According to §11501(b), States (or their subdivisions) "may not":

> "(1) Assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.
> "(2) Levy or collect a tax on an assessment that may not be made under paragraph (1) of this subsection.
> "(3) Levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.
> "(4) Impose another tax that discriminates against a rail carrier."

The following subsection confers jurisdiction on federal courts to "prevent a violation" of §11501(b) notwithstanding the Tax Injunction Act, 28 U. S. C. §1341, which ordinarily prohibits federal courts from enjoining the collection of state taxes when a remedy is available in state

---

[1] This provision was originally codified at 49 U. S. C. §26c (1976 ed.). In 1978, Congress recodified it at §11503 (1976 ed., Supp. II), with slightly altered language but "without substantive change," §3(a), 92 Stat. 1466. In 1995, Congress again recodified the section without substantive change, this time at 49 U. S. C. §11501. This opinion refers to the statute's current text.

court.  §11501(c).[2]

## B

Petitioner CSX Transportation, Inc. (CSX) is an interstate rail carrier that operates in Alabama and pays taxes there.  Alabama imposes a sales tax of 4% on the gross receipts of retail businesses, Ala. Code §40–23–2(1) (2010 Cum. Supp.), and a use tax of 4% on the storage, use, or consumption of tangible personal property, §40–23–61(a) (2003).  Railroads pay these taxes when they purchase or consume diesel fuel.  But railroads' main competitors—interstate motor and water carriers—are generally exempt from paying sales and use taxes on their fuel (although fuel for motor carriers is subject to a separate excise tax).[3]

Alleging that Alabama's tax scheme discriminates against railroads in violation of §11501(b)(4) of the 4–R Act, CSX sued respondents, the Alabama Department of Revenue and its Commissioner (Alabama or State), in Federal District Court.  In particular, CSX complained that the State could not impose sales and use taxes on railroads' purchase and consumption of diesel fuel while

————————

[2] The first sentence of subsection (c) provides: "Notwithstanding section 1341 of title 28 . . . a district court of the United States has jurisdiction . . . to prevent a violation of subsection (b) of this section."  The next sentence concerns the relief available for violations of §§11501(b)(1) and (2): "Relief may be granted under this subsection only if the ratio of assessed value to true market value of rail transportation property exceeds by at least 5 percent the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction."

[3] State law provides that motor carriers need not pay sales or use taxes on diesel fuel so long as they pay a different excise tax of $0.19 per gallon.  Ala. Code §40–17–2(1) (2003) (primary tax of $0.13 per gallon); §40–17–220(e) (2010 Cum. Supp.) (additional tax of $0.06 per gallon).  State law wholly exempts interstate water carriers from sales and use taxes on diesel fuel.  §40–23–4(a)(10); §40–23–62(12).  Nor do these water carriers pay any other tax on the fuel they purchase or consume.  Brief for Respondents 16.

exempting motor and water carriers from those taxes. App. 22 (Complaint ¶26).

The District Court dismissed CSX's suit as not cognizable under the 4–R Act, and the United States Court of Appeals for the Eleventh Circuit affirmed in a brief *per curiam* decision. 350 Fed. Appx. 318 (2009). The Eleventh Circuit rested on its earlier decision in *Norfolk Southern R. Co.* v. *Alabama Dept. of Revenue*, 550 F. 3d 1306 (2008), which involved a nearly identical challenge to the application of Alabama's sales and use taxes.

In *Norfolk Southern*, the Eleventh Circuit rejected the plaintiff railroad's challenge, principally in reliance on this Court's decision in *Department of Revenue of Ore.* v. *ACF Industries, Inc.*, 510 U. S. 332 (1994). In that case, we held that a railroad could not invoke §11501(b)(4) to challenge a generally applicable property tax on the basis that certain non-railroad property was exempt from the tax. *Id.*, at 335. The Eleventh Circuit recognized that the case before it involved sales and use taxes—not property taxes, which the statutory scheme separately addresses. *Norfolk Southern*, 550 F. 3d, at 1314. The court concluded, however, that this difference was immaterial, and accordingly held that a railroad could not object to Alabama's sales and use taxes simply because the State provides exemptions from them. *Id.*, at 1316.

CSX petitioned for a writ of certiorari, arguing that the Eleventh Circuit had misunderstood *ACF Industries* and noting a split of authority concerning whether railroads may bring a challenge under §11501(b)(4) to non-property taxes from which their competitors are exempt.[4] We

———————

[4] Compare *Norfolk Southern R. Co.* v. *Alabama Dept. of Revenue*, 550 F. 3d 1306, 1316 (CA11 2008), and *Atchison, T. & S. F. R. Co.* v. *Arizona*, 78 F. 3d 438, 443 (CA9 1996) (rejecting a railroad's challenge to a use tax that exempted motor carriers), with *Burlington N., S. F. R. Co.* v. *Lohman*, 193 F. 3d 984, 986 (CA8 1999) (entertaining a challenge to a sales and use tax that exempted rail carriers' competitors), *Burling-*

granted certiorari, 560 U. S. \_\_\_\_ (2010), and now reverse.

## II

We begin, as in any case of statutory interpretation, with the language of the statute. *Hardt* v. *Reliance Standard Life Ins. Co.*, 560 U. S. \_\_\_, \_\_\_ (2010) (slip op., at 8). Section 11501(b)(4) provides that a State may not "[i]mpose another tax that discriminates against a rail carrier." CSX wishes to bring an action under this provision because rail carriers, but not motor or water carriers, must pay Alabama's sales and use taxes on diesel fuel. To determine whether this suit may go forward, we must therefore answer two questions. Is CSX challenging "another tax" within the meaning of the statute? And, if so, might that tax "discriminate" against rail carriers by exempting their competitors?[5]

_____

*ton No. R. Co.* v. *Commissioner of Revenue*, 606 N. W. 2d 54, 58–59 (Minn. 2000) (same), and *Atchison, T. & S. F. R. Co.* v. *Bair*, 338 N. W. 2d 338, 348 (Iowa 1983) (same).

[5] We consider here only questions relating to whether CSX can bring a claim for discrimination based on the State's pattern of tax exemptions. We do not consider any issues concerning whether these exemptions actually discriminate against CSX. See *infra*, at 18–19, and n. 8. Alabama has raised two such issues in this Court. First, Alabama contends that in deciding CSX's claim, a federal court must consider not only the specific taxes challenged, but also the broader tax scheme. Brief for Respondents 58–60. Second, the State argues that the court must compare the taxation of CSX not merely to direct competitors but to other commercial entities as well. *Id.*, at 48, n. 7. Most of the dissenting opinion is devoted to supporting the State's argument on this second question. But we leave these and all other issues relating to whether Alabama actually has discriminated against CSX to the trial court on remand to address as and when it wishes. No court in this case has previously considered these questions, and the parties' briefs in this Court have only sketchily addressed them. In addition, the parties dispute whether Alabama waived its claim on the second issue by initially agreeing that "the comparison class consists of motor carriers and water carriers," App. to Pet. for Cert. 12a (internal quotation marks omitted), and proceeding with the litigation on that basis.

An excise tax, like Alabama's sales and use tax, is "another tax" under subsection (b)(4).[6]  The 4–R Act does not define "tax"; nor does the statute otherwise place any matters within, or exclude any matters from, the term's ambit.   In these circumstances, we look to the word's ordinary definition, *Asgrow Seed Co.* v. *Winterboer*, 513 U. S. 179, 187 (1995), and we note what taxpayers have long since discovered—that the meaning of "tax" is expansive.   A State (or other governmental entity) seeking to raise revenue may choose among multiple forms of taxation on property, income, transactions, or activities. "[A]nother tax," as used in subsection (b)(4), is best understood to refer to all of these—more precisely, to encompass any form of tax a State might impose, on any asset or transaction, except the taxes on property previously addressed in subsections (b)(1)–(3).  See *Burlington Northern R. Co.* v. *Superior*, 932 F. 2d 1185, 1186 (CA7 1991) (Subsection (b)(4) includes "an income tax, a gross-receipts tax, a use tax, an occupation tax . . . —whatever").  The phrase "another tax" is a catch-all.

In particular, we see no reason to interpret subsection (b)(4) as applying only to the gross-receipts taxes—known as "in lieu" taxes—that some States imposed instead of property taxes at the time of the Act's passage.  See Brief for Respondents 53–55; Brief for State of Washington et al. as *Amici Curiae* 20–22.  The argument in favor of this construction relies on the House Report concerning

―――――――

We think this question of waiver is also best considered by the trial court.

[6] As originally enacted, the provision that is now 49 U. S. C. §11501(b)(4) prohibited the imposition of "any other tax" that discriminates against a railroad.  §26c (1976 ed.).  The substitution of "another tax" occurred when Congress first recodified the Act.  In line with Congress's statement that revisions made at that time should not be construed as having substantive effect, see n. 1, *supra*, we treat the two terms as synonymous.

the bill, which described subsection (b)(4) as prohibiting "the imposition of . . . the so-called 'in lieu tax.'"  H. R. Rep. No. 94–725, p. 77 (1975).  But the Conference Report on the final bill abandoned the House Report's narrowing language and described the subsection as it was written— as prohibiting, without limitation, "the imposition of any other tax which results in the discriminatory treatment of any" railroad.  S. Conf. Rep. No. 94–595, pp. 165–166 (1976); accord, S. Rep. No. 94–499, p. 65 (1975).  And the statutory language is the real crux of the matter: Subsection (b)(4) speaks both clearly and broadly, and a legislative report misdescribing the provision cannot succeed in altering it.[7]

Nor do we agree with the Eleventh Circuit's apparent view that CSX does not challenge "another tax" because its complaint relies on the exemptions the State has given. See *Norfolk Southern*, 550 F. 3d, at 1315 ("The language of section (b)(4) prohibits a discriminatory 'tax' not a discriminatory tax exemption"); Brief for American Trucking Assns., Inc. as *Amicus Curiae* 9.  What the complaint protests is Alabama's imposition of taxes on the fuel CSX

———————

[7] Alabama also invokes the remedial provision of subsection (c), n. 2, *supra*, to urge that we read §11501 as effectively limited to property or "in lieu" taxes.  According to Alabama, that provision entitles federal courts to grant relief only when States overvalue railroad property under subsections (b)(1) and (b)(2): Federal courts, the State avers, "have no power to enjoin the granting of tax exemptions as a violation of subsection (b)(4), or, apparently [to remedy] *any* violation of subsection (b)(4)."  Brief for Respondents 37.  But that interpretation of subsection (c)'s remedial provision cannot be right, because it would nullify subsection (b)(4) (and, for that matter, subsection (b)(3) as well).  We understand subsection (c)'s remedial provision neither as limiting the broad grant of jurisdiction to federal courts to prevent violations of subsection (b) nor as otherwise restricting the scope of that subsection.  The remedial provision simply limits the availability of relief when a State discriminates in assessing the value of railroad property, as proscribed by subsections (b)(1) and (b)(2).  That kind of discrimination is not at issue here.

uses; what the complaint requests is that Alabama cease
to collect those taxes from CSX. App. 23. The exemptions,
no doubt, play a central role in CSX's argument: They
demonstrate, in CSX's view, that the State's sales and use
taxes discriminate against railroads. See *id.*, at 22, ¶¶24–
26. But the essential subject of the complaint remains the
taxes Alabama levies on CSX.

The key question thus becomes whether a tax might be
said to "discriminate" against a railroad under subsection
(b)(4) because the State has granted exemptions from the
tax to other entities (here, the railroad's competitors). The
statute does not define "discriminates," and so we again
look to the ordinary meaning of the word. See *supra,* at 5.
"Discrimination" is the "failure to treat all persons equally
when no reasonable distinction can be found between
those favored and those not favored." Black's Law Dic-
tionary 534 (9th ed. 2009); accord, *id.*, at 420 (5th ed.
1979); see also Webster's Third New International Dic-
tionary 648 (1976) ("discriminates" means "to make a
difference in treatment or favor on a class or categorical
basis in disregard of individual merit"). To charge one
group of taxpayers a 2% rate and another group a 4%
rate, if the groups are the same in all relevant respects,
is to discriminate against the latter. That discrimination
continues (indeed, it increases) if the State takes the
favored group's rate down to 0%. And that is all an ex-
emption is. See *West Lynn Creamery, Inc.* v. *Healy*, 512
U. S. 186, 210–211 (1994) (SCALIA, J., concurring in judg-
ment) (noting that an "'exemption' from . . . a 'neutral' tax"
for favored persons "is no different in principle" than "a
discriminatory tax . . . imposing a higher liability" on
disfavored persons). To say that such a tax (with such an
exemption) does not "discriminate"—assuming the groups
are similarly situated and there is no justification for the
difference in treatment—is to adopt a definition of the
term at odds with its natural meaning.

   In line with this understanding, our decisions have repeatedly recognized that tax schemes with exemptions may be discriminatory. In *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803 (1989), for example, we reviewed a state income tax provision that exempted retirement benefits given by the State, but not those paid by the Federal Government. We held that the tax "discriminate[d]" against federal employees under 4 U. S. C. §111, which serves to protect those employees from discriminatory state taxation. Similarly, our dormant Commerce Clause cases have often held that tax exemptions given to local businesses discriminate against interstate actors. See, *e.g., Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263, 268–269 (1984) (holding that a state excise tax on alcohol "discriminate[d]" against interstate businesses because of exemptions granted to local producers); *Camps New-found/Owatonna, Inc.* v. *Town of Harrison*, 520 U. S. 564, 588–589 (1997) (invalidating as "discriminatory" a state property tax that exempted organizations operating for the benefit of residents, but not organizations aimed at nonresidents). And even our decision in *ACF Industries*, on which the Eleventh Circuit relied in dismissing CSX's suit, made clear that tax exemptions "could be a variant of tax discrimination." 510 U. S., at 343.

   Nor does the 4–R Act limit the prohibited discrimination to state tax schemes that unjustifiably exempt local actors, as opposed to interstate entities. Alabama argues for this result, claiming that §11501(b) is designed "to protect interstate carriers against discrimination *vis-à-vis* local businesses." Brief for Respondents 29. But the text of §11501(b) tells a different story. Consistent with the Act's purpose of restoring the financial stability of railroads (not of interstate carriers generally), *supra,* at 1, each of subsection (b)'s provisions proscribes taxes that specially burden a *rail carrier's* property or otherwise discriminate against a *rail carrier.* And not a single provision of the

Act (including the references in subsections (b)(1)–(3) to
"commercial and industrial property") distinguishes be-
tween local and non-local taxpayers who receive favorable
tax treatment.  The distinctions drawn in §11501(b) are
not between interstate and local actors, as the State con-
tends, but rather between railroads and other actors,
whether interstate or local.  Accordingly, a state excise tax
that applies to railroads but exempts their interstate
competitors is subject to challenge under subsection (b)(4)
as a "tax that discriminates against a rail carrier."[8]

_____

[8]This conclusion does not, as Alabama and the dissent contend, turn
railroads into "most-favored-taxpayers," entitled to any exemption (or
other tax break) that a State gives to another entity.  See Brief for
Respondents 23; *post*, at 9 (opinion of THOMAS, J.).  We hold only that
§11501(b)(4) enables a railroad to challenge an excise or other non-
property tax as discriminatory on the basis of the tax scheme's exemp-
tions—as the dissent apparently agrees, *post*, at 1.  Whether the
railroad will prevail—that is, whether it can prove the alleged dis-
crimination—depends on whether the State offers a sufficient justifica-
tion for declining to provide the exemption at issue to rail carriers.  See
*supra,* at 8; Brief for United States as *Amicus Curiae* 25–26; *Richmond,
F. & P. R. Co.* v. *Department of Taxation, Commonwealth of Va.*, 762
F. 2d 375, 380–381, and n. 4 (CA4 1985).  So if, to use the dissent's
example, a railroad challenged a scheme in which "every person and
business in the State of Alabama paid a $1 annual tax, and *one person*
was exempt," *post*, at 9, for some reason having nothing to do with
railroads, we presume the suit would be promptly dismissed.  Nothing
in this application of §11501(b)(4) offers a "windfall" to railroads.  *Ibid.*

The dissent argues in addition that a State should prevail against
any claim of discrimination brought under subsection (b)(4) if it can
demonstrate that a tax does not "target" or "single out" a railroad, *post*,
at 1; that showing, without more, would justify the tax (although the
dissent declines to say just what it means to "target," *post*, at 7, n. 3).
This argument primarily concerns the question whether Alabama's tax
scheme in fact discriminates under subsection (b)(4)—a question we
have explained is inappropriate to address, see n. 5, *supra*.  We note,
however, that the dissent's argument about subsection (b)(4) rests
entirely on the premise that subsections (b)(1)–(3) prohibit only prop-
erty taxes that "target" or "single out" railroads, see *post*, at 4; so, the
dissent would say, a State may impose a 4% property tax on railroads

III

As against the plain language of subsection (b)(4), Alabama offers two arguments based on our decision in *ACF Industries*. The first claim, which the Eleventh Circuit accepted, rests on the reasoning we adopted in *ACF Industries:* We concluded there that railroads could not challenge property tax exemptions under subsection (b)(4), and Alabama asserts that the same analysis applies to excise (and other non-property) tax exemptions. The second contention focuses on alleged problems that would emerge in the application of §11501(b) if the rule of *ACF Industries* did not govern all tax exemptions. On this view, even if *ACF Industries'* reasoning is irrelevant to cases involving excise taxes, its holding must extend to those cases to prevent inconsistent or anomalous results. We reject each of these arguments. We stand foursquare behind our decision in *ACF Industries,* but we will not extend it in the way the State wishes.

A

In *ACF Industries*, we considered whether a railroad could sue a State under subsection (b)(4) for taxing railroad property while exempting certain other commercial property. We held that the railroad could not do so. We noted that the language of subsection (b)(4), when viewed in isolation, could be read to allow such a challenge. But we reasoned that the structure of §11501 required the opposite result. 510 U. S., at 343. The Eleventh Circuit

_____

(assuming some unspecified number of other taxpayers also pay that rate) while levying only a 2% property tax on railroad competitors. But we have never decided, in *ACF Industries* or any other case, whether subsections (b)(1)–(3) should be interpreted in this manner. And even accepting the dissent's unexplained premise, a serious question would remain about whether to transplant this construction of subsections (b)(1)–(3) to subsection (b)(4)'s very different terrain, see *infra,* at 16–18.

considered *ACF Industries* "determinative" of the question
here, *Norfolk Southern*, 550 F. 3d, at 1313, and Alabama
agrees, Brief for Respondents 18. We think they misread
that decision.

We began our analysis in *ACF Industries* by explaining
that railroads could not challenge property tax exemptions
under subsections (b)(1)–(3)—the provisions of §11501
specifically addressing property taxes. As noted earlier,
subsections (b)(1)–(3) prohibit a State from imposing
higher property tax rates or assessment ratios on "rail
transportation property" than on "other commercial and
industrial property." The statute defines "commercial and
industrial property" as including only "property . . . subject
to a property tax levy." §11501(a)(4). We interpreted that
phrase to mean "property that is taxed," rather than
property that is potentially taxable. 510 U. S., at 341–342.
As a result, we determined that exempt (*i.e.*, non-taxed)
property fell outside the category of "other commercial and
industrial property" against which the taxation of railroad
property is measured. *Ibid.* The conclusion followed:
Subsections (b)(1)–(3) permitted States to impose property
taxes on railroads while exempting other entities. *Ibid.*

And because that was so, we stated, still another con-
clusion followed: Subsection (b)(4)'s prohibition on dis-
crimination likewise could not encompass property tax
exemptions. *Id.,* at 343. We viewed this holding as a
matter of simple deduction: "It would be illogical to con-
clude that Congress, having allowed the States to grant
property tax exemptions in subsections (b)(1)–(3), would
turn around and nullify its own choice in subsection
(b)(4)." *Ibid.* Or stated otherwise: "[R]eading subsection
(b)(4) to prohibit what" other parts of the statute were
"designed to allow," would "subvert the statutory plan"
and "contravene the 'elementary canon of construction
that a statute should be interpreted so as not to render
one part inoperative.'" *Id.*, at 340. The structure of

§11501 thus compelled our conclusion that property tax exemptions—even if "a variant of tax discrimination," *id.*, at 343—fell outside subsection (b)(4)'s reach.

But this structural analysis—the core of *ACF Industries*—has no bearing on the question here. Subsections (b)(1)–(3) specifically address—and allow—property tax exemptions. But neither those subsections nor any other provision of the 4–R Act speaks to *non*-property tax exemptions like those at issue in this case. Congress has expressed no intent to "allo[w] the States to grant" these exemptions. *Ibid.* Reading subsection (b)(4) as written— to encompass non-property tax exemptions—therefore poses no danger of "nullify[ing]" a congressional policy choice or otherwise "subvert[ing] the statutory plan." *Id.*, at 340, 343. To the contrary: Giving subsection (b)(4) something other than its ordinary meaning, absent any structural reason to do so, would itself contravene the expressed will of Congress.

Implicitly acknowledging that *ACF Industries*' central theory is irrelevant here, Alabama focuses on what that decision called "[o]ther considerations reinforc[ing]" its structural analysis. *Id.*, at 343. Most notably, Alabama underscores the following sentence from *ACF Industries:* "Given the prevalence of property tax exemptions when Congress enacted the 4–R Act, [§11501's] silence on the subject—in light of the explicit prohibition of tax rate and assessment ratio discrimination—reflects a determination to permit the States to leave their exemptions in place." *Id.*, at 344. Alabama asserts that this statement "holds just as true" for sales and use taxes. Brief for Respondents 41.

That claim rings hollow. To be sure, *ACF Industries* noted that Congress had declined to speak "with any degree of particularity to" the permissibility of property tax exemptions, even though States often granted them. 510 U. S., at 343. But we thought that fact relevant only

because Congress *had* spoken with particularity in pro-
scribing other forms of discriminatory property taxes. The
very sentence Alabama highlights makes our reasoning
clear: Congress's silence as to the practice of granting
property tax exemptions reflected its acquiescence in that
practice "*in light of* the explicit prohibition [in subsections
(b)(1)–(3)] of [property] tax rate and assessment ratio
discrimination." *Id.*, at 344 (emphasis added). If that
explicit prohibition had not existed—if §11501(b) had
consisted only of subsection (b)(4)'s broad ban on tax
discrimination—we could not have gleaned what we did
from congressional silence. After all, the very purpose of a
catch-all provision like subsection (b)(4) is to avoid the
necessity of listing each matter (here, each kind of tax
discrimination) falling within it. And with respect to *non*-
property taxes (like Alabama's sales and use taxes), sub-
section (b)(4) is all there is. So here again, our analysis in
*ACF Industries* does not apply because it rested on subsec-
tions (b)(1)–(3)—that is, on the highly reticulated scheme
in the 4–R Act relating solely to property taxes.

Alabama also emphasizes our statement in *ACF Indus-
tries* that "'[p]rinciples of federalism'" supported our hold-
ing, Brief for Respondents 41–43 (quoting 510 U. S., at
345), but this final effort to borrow from that decision's
analysis similarly fails. We indeed recognized in *ACF
Industries* that the 4–R Act limits the traditional taxing
power of the States. Because that is so, we expressed
"hesitan[ce] to extend the statute beyond its evident
scope." 510 U. S., at 345. But here, for all the reasons
already noted, we are not "extend[ing] the statute"; we are
merely giving effect to its clear meaning. To reiterate: The
4–R Act distinguishes between property taxes and other
taxes. Congress expressed its intent to insulate property
tax exemptions from challenge; against that background,
*ACF Industries* stated that permitting such suits would
intrude on the States' rightful authority. By contrast,

Congress drafted §11501 to enable railroads to contest all other tax exemptions; and when Congress speaks in such preemptive terms, its decision must govern. Principles of federalism cannot narrow §11501's clear scope. See, *e.g., CSX Transp., Inc.* v. *Georgia State Bd. of Equalization*, 552 U. S. 9, 20 (2007) (rejecting the idea that federalism principles preclude challenges to state valuation methodologies when §11501 "clearly authorized" such actions). Nothing in *ACF Industries* suggested otherwise.

## B

Alabama additionally makes a subtler argument involving *ACF Industries*. Given that decision, Alabama contends, a ruling in CSX's favor here would create troubling inconsistencies. Alabama claims that subsection (b)(4)'s singular prohibition on "discriminat[ion]" would then mean one thing for property taxes (according to *ACF Industries*) and another for non-property taxes, even though nothing in the statute supports "morphing definitions." Brief for Respondents 32. And still worse than the difference in meaning would be the difference in result: A ruling for CSX, Alabama argues, would give railroads more protection against non-property taxes than against property taxes, even though no good reason exists for this distinction.

Alabama's one-word-two-meanings argument collapses because it again rests on a misunderstanding of *ACF Industries*. That decision did not define "discriminat[e]" or say that a tax exemption could not fall within that term. Quite to the contrary: As noted earlier, *ACF Industries* frankly acknowledged that tax exemptions, including property tax exemptions, "could be a variant of tax discrimination." 510 U. S., at 343; *supra,* at 9. We held that property tax exemptions were immune from challenge under subsection (b)(4) for structural, rather than linguistic, reasons. Even assuming these exemptions "discrimi-

nate[d]," they did so in a way that the specific provisions of §§11501(b)(1)–(3) allow, and accordingly §11501(b)(4)'s prohibition could not include them. That reasoning, once more, does not apply here, because subsections (b)(1)–(3) do not permit—indeed, in no way address—non-property tax exemptions. We therefore do not adopt a new definition of "discriminate" in this case; in the context of the 4–R Act, that word has, and has always had, just one meaning.

What remains is Alabama's complaint that a ruling in CSX's favor, when combined with our decision in *ACF Industries,* will result in divergent treatment of property and non-property taxes. At times, Alabama dresses up this objection in Latin: It contends that the canon of *ejusdem generis*, which "limits general terms [that] follow specific ones to matters similar to those specified," *Gooch* v. *United States*, 297 U. S. 124, 128 (1936), has a role to play in interpreting §11501(b). More particularly, Alabama contends that this canon supports reading into §11501(b)(4) every limitation contained in §§11501(b)(1)–(3), including the exclusion of tax exemptions from the class of state actions subject to challenge. See Brief for Respondents 26–27. That interpretive move, Alabama rightly notes, would ensure equal treatment of property tax and non-property tax exemptions.

But we think *ejusdem generis* is not relevant here. As an initial matter, subsection (b)(4), "[a]lthough something of a catchall, . . . is *not* a general or collective term following a list of specific items to which a particular statutory command is applicable (*e.g.*, 'fishing rods, nets, hooks, bobbers, sinkers, and other equipment')." *United States* v. *Aguilar*, 515 U. S. 593, 615 (1995) (SCALIA, J., concurring in part and dissenting in part). Rather, that subsection is "one of . . . several distinct and independent prohibitions." *Ibid.* Related to this structural point is a functional one. We typically use *ejusdem generis* to ensure that a general word will not render specific words meaningless. *E.g.,*

*Circuit City Stores, Inc.* v. *Adams*, 532 U. S. 105, 114–115 (2001); see 2A N. Singer, Sutherland on Statutes and Statutory Construction §47:17 (7th ed. 2007). But that concern is absent here. Reading subsection (b)(4) to cover non-property tax exemptions will not deprive subsections (b)(1)–(3) of effect, because those subsections are addressed only to property taxes. A canon meaning literally "of the same kind" has no application to provisions directed toward dissimilar subject matter.

The better version of Alabama's claim reads entirely in English; it is simply that distinguishing between property tax exemptions and other tax exemptions makes not a whit of sense. We are not much inclined to disagree. Neither CSX nor the United States as *amicus curiae* has offered a satisfying reason for why Congress drew this line—why in §§11501(b)(1)–(3) it barred challenges based on property tax exemptions, but then turned around in §11501(b)(4) to allow challenges based on, say, excise tax exemptions. See Tr. of Oral Arg. 4–5, 24–25. CSX, for example, has not presented any evidence that different tax exemptions posed different levels of threat to railroads' financial stability. So even if Congress had a good reason for distinguishing between property and non-property tax exemptions, we acknowledge that it eludes us.

But this admission does not take us far in Alabama's direction. Even if the 4–R Act were ambiguous, we doubt we would interpret subsection (b)(4) to replicate each facet of subsections (b)(1)–(3). Treating property tax exemptions and other tax exemptions equivalently might make sense, as Alabama argues. But so too might allowing railroads to challenge all taxes (property or non-property) that contain exemptions. After all, as we noted earlier, tax exemptions are an obvious form of tax discrimination. See *supra,* at 8–9. It is hardly self-evident why Congress would prohibit a State from charging a railroad a 4% tax and a competitor a 2% tax, but allow the State to charge

the railroad a 4% tax and the competitor nothing. The latter situation would frustrate the purposes of the Act even more than the former. In *ACF Industries*, we accepted that anomaly because the terms and structure of the Act demanded that we do so. But we could say no more in favor of the result than that it was "not so bizarre that Congress could not have intended it." 510 U. S., at 347 (internal quotation marks omitted). That was not a glowing recommendation, and we see no reason today to view the matter differently. Accordingly, even assuming that statutory ambiguity permitted us to do so, we would hesitate to extend the distinction between tax exemptions and differential tax rates in order to avoid a distinction between property and non-property taxes. That would seem a poor trade of statutory anomalies.

In any event, and more importantly, the choice is not ours to make. Congress wrote the statute it wrote, and that statute draws a sharp line between property taxes and other taxes. Congress drafted §§11501(b)(1)–(3) to exclude tax exemptions from the sphere of prohibited property tax discrimination. But it drafted §11501(b)(4) more broadly, without any of the prior subsections' limitations, to proscribe other "tax[es] that discriminat[e]," including through the use of exemptions. That congressional election settles this case. Alabama's preference for symmetry cannot trump an asymmetrical statute. And its preference for the greatest possible latitude to levy taxes cannot trump Congress's decision to restrict discriminatory taxation of rail carriers.

## IV

Our decision in this case is limited. We hold that CSX may challenge Alabama's sales and use taxes as "tax[es] that discriminat[e] against . . . rail carrier[s]" under §11501(b)(4). We do not address whether CSX should prevail in that challenge—whether, that is, Alabama's

taxes in fact discriminate against railroads by exempting interstate motor and water carriers. Alabama argues, in support of barring CSX's challenge at the outset, that this inquiry into discrimination may pose difficulties. Brief for Respondents 35–37. We cannot deny that assertion, but neither can we respond to it by precluding CSX's claim. Discrimination cases sometimes do raise knotty questions about whether and when dissimilar treatment is adequately justified. In the context of the 4–R Act, those hard calls can arise when States charge different tax rates to different entities in a practice the statute specifically subjects to challenge. See §11501(b)(3). So too, difficult issues can emerge when, as here, States provide certain entities with tax exemptions. In either case, Congress has directed the federal courts to review a railroad's challenge; and in either case, we would flout the congressional command were we to declare the matter beyond us.

For the reasons stated, we reverse the judgment of the Eleventh Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 09–520

CSX TRANSPORTATION, INC., PETITIONER *v.*
ALABAMA DEPARTMENT OF REVENUE
ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[February 22, 2011]

JUSTICE THOMAS, with whom JUSTICE GINSBURG joins,
dissenting.

I agree with the Court that Alabama's sales and use
taxes are "another tax" within the meaning of 49 U. S. C.
§11501(b)(4) and that a scheme of tax exemptions is capable of making a tax discriminatory. *Ante*, at 6–8. As a
general matter, therefore, I agree that Alabama's sales
and use taxes could potentially violate subsection (b)(4),
and would do so if their exemptions "discriminate[d]
against a rail carrier." §11501(b)(4). The majority's holding stops there, see *ante*, at 10, n. 8, but I would go on.

I would hold that, to violate §11501(b)(4), a tax exemption scheme must target or single out railroads by comparison to general commercial and industrial taxpayers.
Although parts of the majority's discussion appear to
question this standard, see *ante*, at 8–11, the limited
holding does not foreclose it. Because CSX cannot prove
facts that would satisfy that standard in this case, I would
affirm.

## I

In my view, "another tax that discriminates against a
rail carrier" in §11501(b)(4) means a tax—or tax exemption scheme—that targets or singles out railroads as

compared to other commercial and industrial taxpayers.
That reading settles the ambiguity in the word "discrimi-
nates" by reference to the rest of the statute and gives
subsection (b)(4) a reach consistent with the problem the
statute addressed.

## A

"Discriminates," standing alone, is a flexible word.
Compare, *e.g.*, *Clackamas Gastroenterology Associates,
P. C.* v. *Wells*, 538 U. S. 440, 446 (2003) ("[T]he statutory
purpose of [the Americans with Disabilities Act of 1990 is]
ridding the Nation of the evil of discrimination"), with
*Davis* v. *Bandemer*, 478 U. S. 109, 132 (1986) (plurality
opinion) ("[U]nconstitutional discrimination occurs only
when the electoral system is arranged in a manner that
will consistently degrade a voter's or a group of voters'
influence"); and *United Haulers Assn., Inc.* v. *Oneida-
Herkimer Solid Waste Management Authority*, 550 U. S.
330, 338 (2007) ("In this context, 'discrimination' simply
means differential treatment of in-state and out-of-state
economic interests that benefits the former and burdens
the latter" (some internal quotation marks omitted)).

Even though "discriminate" has a general legal meaning
relating to differential treatment, its precise contours still
depend on its context. See *Guardians Assn.* v. *Civil Serv.
Comm'n of New York City*, 463 U. S. 582, 592 (1983) (opin-
ion of White, J.) ("The language of Title VI on its face is
ambiguous; the word 'discrimination' is inherently so");
*Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 284 (1978)
(opinion of Powell, J.) ("The concept of 'discrimination' . . .
is susceptible of varying interpretations"). Here, the word
"discriminates" in subsection (b)(4) is ambiguous as to the
appropriate comparison class. *Burlington Northern R. Co.*
v. *Commissioner of Revenue*, 509 N. W. 2d 551, 553 (Minn.
1993) ("To be discriminatory, a tax must be discriminatory
as compared to someone else"). It is also ambiguous as to

what type of difference is required to violate the statute—
*e.g.*, any distinction, singling out, or something in between.

Therefore, I would use the context to resolve the mean-
ing of the word as it is used in subsection (b)(4). See *Rob-
inson* v. *Shell Oil Co.*, 519 U. S. 337, 341 (1997) (statutory
interpretation focuses on "the language itself, the specific
context in which that language is used, and the broader
context of the statute as a whole"). We did precisely that
in *Department of Revenue of Ore.* v. *ACF Industries, Inc.*,
510 U. S. 332 (1994), where we similarly faced a question
about the meaning of subsection (b)(4). In that case, our
structural analysis of §11501(b) was "central to the inter-
pretation of subsection (b)(4)." *Id.,* at 340.

1

The structure of §11501(b) is straightforward. Subsec-
tions (b)(1) through (3) instruct that States may not assess
railroad property at "a higher ratio to the true market
value . . . than . . . other commercial and industrial prop-
erty," 49 U. S. C. §11501(b)(1), collect taxes based on those
inflated assessments, §11501(b)(2), or set property tax
rates for railroad property higher than that "applicable to
commercial and industrial property" in the same assess-
ment jurisdiction, §11501(b)(3). Subsection (b)(4) then
forbids "[i]mpos[ing] another tax that discriminates
against a rail carrier."

I would look to subsections (b)(1) through (3) to deter-
mine the meaning of "discriminates" in (b)(4). As many
lower courts have correctly recognized, subsection (b)(4)
is a residual clause, naturally appurtenant to subsections
(b)(1) through (3).[1] Moreover, the phrase "another tax that
discriminates" in subsection (b)(4) suggests that the previ-

_____

[1] See, *e.g., Kansas City Southern R. Co.* v. *McNamara*, 817 F. 2d 368,
373–374 (CA5 1987); *Burlington Northern R. Co.* v. *Superior*, 932 F. 2d
1185, 1186 (CA7 1991); *Alabama Great Southern R. Co.* v. *Eagerton*,
663 F. 2d 1036, 1041 (CA11 1981).

ous subsections all describe taxes that "discriminate" in a manner similar to that forbidden by subsection (b)(4). See *Washington State Dept. of Social and Health Servs.* v. *Guardianship Estate of Keffeler*, 537 U. S. 371, 384 (2003) (reading the phrase "other legal process" restrictively because "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words" (internal quotation marks and brackets omitted)).

Subsections (b)(1) through (3) each prohibit particular types of state taxes that target or single out railroad property for less favorable tax treatment than other commercial and industrial property. First, the "discriminat[ion]" addressed in subsections (b)(1) through (3) can only be described as taxes that target or single out railroad property. Those subsections specifically concern taxes that affect railroad property differently from the way they affect a larger class of comparative taxpayers' property. See §§11501(b)(1)–(3); cf. *ante*, at 9 ("[E]ach of subsection (b)'s provisions proscribes taxes that specially burden a rail carrier's property or otherwise discriminate against a rail carrier" (emphasis deleted)). Second, each subsection refers to the same comparison class—other "commercial and industrial property." §§11501(b)(1)–(3).

I think it follows that, under subsection (b)(4), a tax "discriminates against a rail carrier" if it similarly targets railroads for tax treatment less favorable than other commercial and industrial taxpayers. As we found in *ACF Industries*, the structure of the statute provides a light by which to navigate the meaning of subsection (b)(4).

2

The background of §11501(b) also supports this understanding of subsection (b)(4). In previous cases, we have identified the problem that made subsection (b) necessary.

At the time the Railroad Revitalization and Regulatory Reform Act (4–R Act) was enacted, it was clear that "railroads '"are easy prey for State and local tax assessors" in that they are "nonvoting, often nonresident, targets for local taxation," who cannot easily remove themselves from the locality.'" *ACF Industries*, *supra,* at 336 (quoting *Western Air Lines, Inc.* v. *Board of Equalization of S. D.*, 480 U. S. 123, 131 (1987) (quoting, in turn, S. Rep. No. 91–630, p. 3 (1969))). The "temptation to excessively tax nonvoting, nonresident businesses . . . made federal legislation in this area necessary." *Western Air Lines, supra,* at 131; see also *Burlington Northern R. Co.* v. *Oklahoma Tax Comm'n*, 481 U. S. 454, 457 (1987) (noting that "[a]fter an extended period of congressional investigation, Congress concluded that 'railroads are over-taxed by at least $50 million each year'" (quoting H. R. Rep. No. 94–725, p. 78 (1975))).

In other words, §11501(b) responded primarily to what its text describes—property taxes that soaked the railroads. The obvious rationale supporting subsections (b)(1) through (3) is that the "way to prevent tax discrimination against the railroads is to tie their tax fate to the fate of a large and local group of taxpayers." *Kansas City Southern R. Co.* v. *McNamara*, 817 F. 2d 368, 375 (CA5 1987); see also *Atchison, T. & S. F. R. Co.* v. *Arizona*, 78 F. 3d 438, 441 (CA9 1996). In this way, subsections (b)(1) through (3) establish a political check on the taxation of railroads. States cannot impose excessive property taxes on the nonvoting, nonresident railroads without imposing the same taxes more generally on voting, resident local businesses.

Absent any indication that subsection (b)(4), as a residual clause, has any different aim, it is reasonable to conclude that it shares the same one as subsections (b)(1) through (3). See, *e.g., Kansas City Southern R. Co., supra,* at 373–374 (Congress included subsection (b)(4) "to ensure

that states did not shift to new forms of tax discrimination outside the letter of the first three subsections"); *Burlington Northern R. Co.* v. *Superior*, 932 F. 2d 1185, 1186 (CA7 1991) ("Subsection (b)(4) is . . . designed to prevent the state from accomplishing the forbidden end of discriminating against railroads by substituting another type of tax"). Subsection (b)(4) should be understood to tackle the issue of systemic railroad over-taxation the same way that the other subsections do—by linking the taxation of railroads to the taxation of businesses with local political influence. Thus, a "tax that discriminates against a rail carrier" is a tax that targets or singles out rail carriers compared to commercial and industrial taxpayers.

                                    B

Under this test, CSX's complaint was properly dismissed. CSX has not alleged that Alabama's sales and use taxes target railroads compared to general commercial and industrial taxpayers. See *ACF Industries*, 510 U. S., at 346–347 (leaving open a case in which "railroads—either alone or as part of some isolated and targeted group—are the only commercial entities" subject to a tax); *Norfolk Southern R. Co.* v. *Alabama Dept. of Revenue*, 550 F. 3d 1306, 1316 (CA11 2008). CSX alleges that it paid a tax on its fuel that certain rail competitors did not have to pay. But it concedes, as it must, that the sales and use taxes are "generally applicable." Pet. for Cert. i; see Ala. Code §40–23–2(1) (2010 Cum. Supp.) (imposing a four percent sales tax on "every person, firm, or corporation . . . selling at retail any tangible personal property whatsoever"); §40–23–61(a) (2003); see also *Norfolk Southern R. Co.*, *supra,* at 1316; Tr. of Oral Arg. 36.

Discrete exemptions for certain railroad competitors—namely, fuel exemptions for interstate motor carriers and interstate ships and barges—do not make a generally applicable tax "discriminat[ory]" under subsection (b)(4).

Widespread exemptions could theoretically cause a facially general tax to target railroads, but the limited exemptions at issue here do not suggest that, and CSX has not argued it.[2] Accordingly, CSX has not stated a cognizable claim for discrimination under §11501(b)(4).

## II

The Court does not settle the ambiguity in the word "discriminates" in subsection (b)(4)—leaving open both the appropriate comparison class and the type of differential treatment required to constitute discrimination.[3] The majority "hold[s] only that §11501(b)(4) enables a railroad to challenge an excise or other non-property tax as discriminatory on the basis of the tax scheme's exemptions." *Ante*, at 10, n. 8. Thus, when the majority says that "a state excise tax that applies to railroads but exempts their interstate competitors is subject to challenge under subsection (b)(4)," *ante*, at 10, it must mean only that a tax exemption scheme could potentially violate subsection (b)(4).

As I understand it, the majority does not decide whether

———————

[2] Although the majority rightly observes that whether a given tax is discriminatory may often be a difficult question, see *ante*, at 19, this is not a close case. I therefore need not define the exact boundaries of what constitutes targeting or singling out. See, *e.g., Norfolk Southern R. Co.* v. *Alabama Dept. of Revenue*, 550 F. 3d 1306, 1316, n. 16 (CA11 2008) (listing examples of courts finding railroads targeted by various state tax schemes).

[3] The majority declines to reach the comparison class issue. But the question presented was: "Whether a State's exemptions of rail carrier competitors, but not rail carriers, from generally applicable sales and use taxes on fuel subject the taxes to challenge under 49 U. S. C. §11501(b)(4) as 'another tax that discriminates against a rail carrier.'" The question presented thus asks whether CSX can challenge a "generally applicable" tax based on exemptions granted to rail competitors—a straightforward comparison class issue. The lower courts have split over the proper scope of the comparison class, and the issue was presented in this case. I would decide it.

CSX has stated a claim even in this case but instead leaves that issue for remand. Accordingly, States remain free to argue—and lower courts to hold—that complaints like CSX's should be dismissed for failing to state a "discriminat[ion]" claim under §11501(b)(4) when they do not allege that railroads are targeted or singled out compared to commercial and industrial taxpayers generally.

Nonetheless, despite the majority's assertion that it is "inappropriate" to address whether Alabama's tax scheme actually discriminates within the meaning of §11501(b)(4), *ante,* at 10, n. 8, parts of its opinion suggest an answer to that question that I believe is incorrect. Relying on the second definition in Black's Law Dictionary, the majority defines "discriminates" as "'failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored.'" *Ante*, at 8. This definition of "discriminate," combined with the majority's insistence that the "distinctions drawn in §11501(b) are . . . between railroads and other actors, whether interstate or local," suggests that the comparison class could be *anyone*.[4] *Ante,* at 10. The majority ultimately implies that "another tax that discriminates against a rail carrier" is any tax that draws a distinction between a rail carrier and anyone else without sufficient justification. See *ante,* at 10, n. 8 ("Whether the railroad will prevail . . . depends on whether the State offers a sufficient justification for de-

––––––––––

[4] A comparison class of "anyone" is broader than either of the sides in the lower courts' split on this issue. Courts usually disagree over whether to use commercial and industrial taxpayers or railroad competitors as the comparison class. Compare *Burlington Northern, S. F. R. Co.* v. *Lohman,* 193 F. 3d 984, 985–986 (CA8 1999) (applying a comparison class of rail competitors); *Burlington Northern R. Co.* v. *Commissioner of Revenue*, 509 N. W. 2d 551, 553 (Minn. 1993) (same), with *Kansas City Southern R. Co.*, 817 F. 2d, at 375 (using commercial and industrial taxpayers as the comparison class); *Atchison, T. & S. F. R. Co.* v. *Arizona*, 78 F. 3d 438, 441 (CA9 1996) (same).

clining to provide the exemption at issue to rail carriers").

I do not read subsection (b)(4) so independently of (b)(1) through (3). Perhaps, as the majority asserts, subsection (b)(4) is not an ideal candidate for *ejusdem generis*. *Ante*, at 16–17. But given the ambiguity of subsection (b)(4), (b)(1) through (3) are the best guides for understanding its proper scope—something we recognized in *ACF Industries*. 510 U. S., at 343. It is more reasonable to discern the meaning of "discriminates" in subsection (b)(4) using the preceding subsections than to pluck from the dictionary a definition for such a context-dependent term.

Detaching subsection (b)(4) from the rest of the section would expand its meaning well beyond the scope of the problem that necessitated §11501(b). Instead of simply eliminating the particular vulnerability of railroads by tying their tax fate to that of general commercial and industrial taxpayers, railroads would receive a surprising windfall: most-favored taxpayer status. This would convert subsection (b)(4) from a shield into a sword.

The implication of the majority opinion is that if every person and business in the State of Alabama paid a $1 annual tax, and *one person* was exempt, CSX could sue under subsection (b)(4) and require the State to either exempt CSX also or "offe[r] a sufficient justification" for the distinction. See *ante*, at 10, n. 8. Although the majority denies that this would provide railroads most-favored-taxpayer status, see *ibid.*, it acknowledges that States would have to justify any tax distinction that railroads argue may disfavor them.

The only bulwark against requiring States to give railroads every tax exemption that anyone else gets would be open-ended judicial determinations of what is "sufficient justification" for such distinctions. *Ibid.* Unsurprisingly, the statute provides no guidance for what "sufficient justification" might mean, but neither does the majority. There are all sorts of reasons that might lead a State to

distinguish between railroads and others for tax purposes.
See Tr. of Oral Arg. 58. For instance, in this case, Ala-
bama points out that motor carriers and interstate water
carriers pay a separate—and frequently higher—tax on
fuel from which railroads are effectively exempt. Brief for
Respondents 12–16, 59–60. That might be a "sufficient
justification" for their exemptions from the taxes here, but
the majority expressly disclaims reaching that question.
*Ante*, at 5, n. 5.[5] Of course, logically extending the mean-
ing of "discriminates" from subsections (b)(1) through (3)
would avoid this problem, as there is no need for "justifica-
tion" at all: A tax either targets railroads by comparison to
commercial and industrial taxpayers or it does not.

*    *    *

I disagree with the meaning of "discriminat[e]" in sub-
section (b)(4) that the majority seems to imply. The rest of
§11501(b) provides a logical and coherent way to deter-
mine what subsection (b)(4) means, and we have used that
methodology before. See *ACF Industries*, 510 U. S., at
340. The best way to read subsection (b)(4) is as prohibit-
ing taxes that target or single out railroads as compared to
general commercial and industrial taxpayers. That is the
test I would establish, and I do not understand the major-
ity to foreclose the lower courts from utilizing it. Under
that test, CSX's challenge to Alabama's sales and use
taxes was properly dismissed. Accordingly, I respectfully
dissent.

--------

[5] The majority appears to consider "sufficient justification" as a poten-
tial defense for the State, see *ante*, at 10, n. 8, but since it derives from
the meaning of "discriminates," a lack of sufficient justification would
seem to be a part of what a railroad would have to plead in order to
state a claim for a violation of §11501(b)(4).